**Harry A. WIBERG, Appellant,**

v.

**GULF COAST LAND & DEVELOPMENT COMPANY et al., Appellees.**

No. 6551.

Court of Civil Appeals of Texas.

Beaumont.

June 21, 1962.

On Rehearing Sept. 5, 1962.

Sonfield & Sonfield, Houston, for appellant.

N. A. Smith and J. P. Madole, Jr., Pasadena, for appellees.

McNEILL, Justice.

This action was instituted by appellant against two corporations, Tex-America Trust Company and Gulf Coast Land & Development Company, appellees, to recover commissions on sale of corporate stock of Tex-America Trust Company which were alleged to be due him. As will be explained herein, the suit finally became one against the Gulf Coast Land & Development Company, successor to Tex-America Trust Company. Gulf Coast Land & Development Company will be referred to as appellee and appellant will at times be referred to as Wiberg.

The Tex-America Trust Company was formed in 1953 by H. C. Donahoe, Carter Chase and appellant, Harry A. Wiberg. Its charter was granted by the Secretary of State with capital stock of 300 shares at $1.00 par value. These three men were the directors of said corporation. All of the stock was owned by the three, except certain qualifying shares in the names of two other persons. It was determined by the stockholders on April 11, 1955, to amend the charter of the corporation and increase the stock so that it would have one million shares of stock of no par value. The amended charter filed with the Secretary of State reflected that the three directors subscribed and paid for corporate stock of the value of $133,633.36. Upon being advised on May 6, 1955, that the Secretary of State had filed the amended charter, a special meeting of the Board of Directors of the company was held at which time the entire Board composed of Donahoe, Chase and Wiberg, were present. Among the matters attended to at this meeting was the question of need of a successful completion of the stock sales program, and it was decided that Chase and Wiberg would handle this. Accordingly, on resolution proposed by Donahoe and seconded by Chase, it was:

"RESOLVED: That Carter Chase, President, and Harry A. Wiberg, Secretary, be given a contract of employment, whether by management-type contract or otherwise, for a period of one year from August 1, 1955, renewable annually thereafter for four additional years, under the terms of which, in consideration of their devoting their entire time to Tex-America Trust Company, each of them shall be compensated as follows: A salary, payable semi-monthly on the 1st and 15th, equal

to 7½% to Wiberg and 7½% to Chase of the total sales price of capital stock of the company sold during the two weeks period next preceding."

The minutes of this meeting recited that Chase called attention to the fact that he and Wiberg had devoted many months of effort to the affairs of this corporation, and would be expected to devote their entire time between the date of this meeting and August 1, 1955, effective date of such contract, for which services they had not received nor would receive compensation. Chase and Wiberg both stated they would waive compensation prior to August 1, 1955, " * ̄ * * ̄ provided they were protected in some manner against the possibility of their respective contracts not being renewed from year to year during the five year period stated." Accordingly, on motion of Mr. Chase and seconded by Mr. Wiberg, it was

"RESOLVED: That in the event of the Board of Directors elects for any year of the five year term of the contract of employment given Chase and Wiberg, not to renew the same, then Chase and Wiberg shall each be paid 7½% of the gross sales price of all capital stock of the corporation sold between May 6, 1955, and the date of such termination, less the amounts of salary with which they have each been credited."

A special meeting of the stockholders and the Board of Directors of Tex-America Trust Company was held the next day, May 7, 1955, at 3 p. m., at which all the directors of said corporation attended. The same persons, owning a majority of the stock of the corporation, were also present and acted as stockholders. At this meeting the accounting firm of Farb-Brockstein & Company, CPA's, were employed as auditors and accountants for the company on a year to year basis. The minutes of this meeting also reflected the following:

"Secretary Wiberg then read to the meeting the minutes of a special meeting of the Board of Directors held on May 6, 1955. By unanimous vote on motion duly made and seconded, those present, acting both as stockholders and directors, approved the action of the Board of Directors as taken at such meeting and as reflected by such minutes."

No further formal action toward making a completed contract was taken than the resolutions thus stated. However, Chase and Wiberg entered upon and started performing their duties in connection with the sale of the corporate stock under the resolutions passed by the Board on May 6, 1955. The record does not indicate clearly just how well the stock sales moved along for awhile, but at any rate the stock was sold for various amounts, beginning as low as 66⅔rd cents per share and gradually increasing in 1956, the price set by the Board was $6.60 per share and thereafter some was sold for as high as $8.25 per share. These two men, Chase and Wiberg, employed a sales force and they paid these employees out of commissions they, Chase and Wiberg, were to earn. Daily deposits of proceeds of stock sales were made to the credit of the company in the proper bank, and at each Board of Directors' meeting thereafter reports were made by Wiberg reflecting the progress made. The sales had not grown to any material amount until the latter part of December, 1955, and on account of ill health of Chase he resigned from the company and gave up the sale of stock operations, effective February 24, 1956. Thereafter all stock sales were handled for the company by appellant until he was notified at a Directors' meeting, held on June 23, 1957, that no further sales of stock were to be made under the arrangements existing with him.

Appellant's suit for commissions earned and unpaid amounted to the sum of $33,-292.00. This amount was arrived at and based upon proceeds of sales of stock between May 6, 1955 and June 23, 1957 of $443,833.36, from which amount of sales appellant claims he received no compensation. It was further alleged that he sold

737,515 shares of such stock, which produced $718,873.36 on which he had been paid the sum of $39,659.87, and there was a balance owing him of $33,292.00. An alternative plea was made that he recover such sum on the basis of value of services rendered with full knowledge, consent and acceptance of defendant. However, this count is not urged on this appeal and no further comment thereon will be made.

Appellee answered appellant's suit and urged, among other defenses, that since no written contract, other than the resolutions was prepared and executed by the contracting parties, no completion of the contract was made as appeared to be contemplated by the resolutions, and no contract existed between the parties. It was further urged that if a contract existed, since Chase and Wiberg were members of the board of three directors, their vote therefor was necessary and they having voted to approve this contract between them and their corporation, the contract was void as against public policy and cannot be enforced in this suit.

It is proper to state that during the time the stock sales program was carried on Tex-America Trust Company formed the Gulf Coast Land & Development Company as a subsidiary which was wholly owned and controlled by Tex-America Trust Company. But before this suit was filed the corporate existence of Gulf Coast Land & Development Company had been dissolved, its assets and liabilities passed to Tex-America Trust Company and the name of Tex-America Trust was changed to Gulf Coast Land & Development Company; hence the style of this suit.

Trial was to a jury and special issues were submitted. The substance of the jury's findings insofar as pertinent here, are:

(1) Wiberg and Tex-America Trust Company intended the resolutions of the Board of Directors of said corporation of May 6, 1955, were to be the agreement whereby Wiberg was employed to sell its stock (Special Issue No. 1 and answer);

(2) That the resolutions adopted by the Board of Directors of said company on May 6, 1955 were thereafter ratified and confirmed by such corporation (Special Issue No. 4 and answer);

(3) That Chase, Donahoe and Wiberg subscribed and paid for stock to the amount of $133,633.36 before May 6, 1955, (Special Issue No. 7 and answer).

Upon this verdict, appellant moved for judgment in his favor for the sum of $33,292.00 or in the alternative for the sum of $24,085.56. The court granted judgment in his behalf for $4,233.13 and the further sum of $1,500.00 as attorneys' fees.

Both parties have appealed from this judgment. And both have filed helpful briefs, as well as supplemental briefs. In addition, after this cause was orally argued before us, we granted appellee's motion to perfect the record. By motion to strike, appellant urges this was error. Since appellee properly complained of the question in its motion for instructed verdict at the close of the evidence, as is pointed out in the next paragraph below, it is unnecessary to act on appellant's motion to strike the supplemental transcript filed.

The first question to be disposed of is the defense urged by appellee that the resolutions passed by the Board of Directors on May 7, 1955, whereby Chase and Wiberg "be given a contract of employment, whether by a management-type contract or otherwise" was not sufficient to create the contract, as the quoted language indicated something additional was to be done before the contract could be held a completed one. And further that this was a question of law to be determined by the court, and special issue No. 1 should not have been submitted to the jury. Since appellee filed its timely motion for instructed verdict urging this point, brought forward in its motion for new trial, the point is properly raised. Gray v.

Blau, Tex.Civ.App., 223 S.W.2d 53. The point, though, is without merit. The facts on this issue, aside from the ambiguous language of the resolution just quoted from, are without dispute. All the directors of the company at the date of the resolution, as well as succeeding directors, and all officers and employees of the company acted upon and treated the stock sales program set forth in the resolutions as the contract for over two years. Great sums of money were obtained by the company over this period of time and commissions paid every two weeks for stock sales of this period. Application was made during this time for registration of securities with the Secretary of State in which these commissions were set forth; and this application was prepared by legal counsel for the company. By common consent and actual dealings, all parties recognized the resolutions passed as the contract itself, and their practical construction should be upheld. 13 Tex.Jur.2d, Sec. 91, pp. 238–241, Sec. 128, p. 300. The word "otherwise", in the expression "whether by a management-type contract or otherwise", means, "In another manner; differently." The actual dealings and conduct of the parties as here delineated is sufficient to make the contract enforceable. Johnson v. Breckenridge-Stephens Title Co. (Com.App.), 257 S.W. 223. The submission of the issue to the jury was, therefore, harmless.

Appellee maintains that since Tex-America had but three directors, Donahoe, Chase and Wiberg, it took at least two disinterested directors to approve the contract. It asserts Chase and Wiberg being recipients of the contract and therefore personally interested could not vote to approve the contract, and the action taken by the Board was against public policy. Appellant counters by asserting that since the acts of the directors were ratified by the special stockholders' meeting on May 7, 1955, and by the special stockholders' meeting of September 22, 1955, at which there were 80% of the stockholders in attendance and all voted in favor of approving all acts of the officers done since May 8, 1955, the contract made

was fair, just and beneficial to the corporation, and full disclosure of the circumstances surrounding such contract was made by Chase and Wiberg, the contract should be upheld. The parties have cited many cases in their briefs. From these cases and others we have found, we summarize the following principles of law controlling the present case:

■ The director of a corporation stands in a fiduciary relationship to his company. He must act fairly and honestly with it and make full disclosure of all pertinent information in relation to the subject matter of any contract he would negotiate with it in which he has a personal interest. Tenison v. Patton, 95 Tex. 284, 67 S.W. 92. And it is improper for a director to vote on a transaction in which he is personally involved. Vol. 3 Hildebrand, Tex.Corps., Sec. 698, p. 61. He is not, however, in the strict sense a trustee. Paddock v. Siemoneit, 147 Tex. 571, 218 S.W.2d 428.

■ If the contract is made with a director and his vote is necessary to authorize the contract, the contract is unenforceable. Davis v. Nueces Irrigation Co., 103 Tex. 243, 126 S.W. 4; Dunagan v. Bushey, 152 Tex. 630, 263 S.W.2d 148; McLendon Hdwe. Co. v. Black, Tex.Civ.App., 264 S.W. 1011. If in the last instance, however, the contract appears to be one that was fair, just and beneficial to the corporation, and the director personally involved has made a full disclosure, such contract may be ratified by a majority of the stockholders of the company. Pruitt v. Westbrook, Tex.Civ.App., 11 S.W.2d 562; 19 C.J.S. Corporations § 783, pp. 156, 157. Appellee urges the holding in Dunagan v. Bushey, supra, as authority for the proposition that only 100% of the stockholders could ratify the contract. The facts in that case are materially different from those before us now. There the contract was actually detrimental to the corporation involved.

■ The record before us shows that the commissions charged were reasonable and

**568**

the contract was fair, just and beneficial to the corporation. It was ratified by over a majority of the company's stockholders. No fraud or overreaching was alleged or proved. From the facts it appears that the directors personally interested did not hold back from the company any pertinent information involving the contract. We, therefore, uphold it.

What we have said disposes of the points and cross-points on this appeal.

 There remains to be determined the proper judgment upon the facts. The total sales price of all stock sold for the corporation was $718,873.36. The jury's anwer to Issue No. 7 reflected that the sum of $133,-633.36 was the amount of stock subscribed and paid for by appellant and his fellow directors before May 6, 1955, the date the resolution was passed authorizing Chase and Wiberg to sell stock. The trial court deducted this sum from the total sales price of stock sold. Appellant asserts that this was error. He urges that in some way, which is not satisfactorily explained, this stock which had been subscribed and paid for by the directors was again sold and the corporation received the proceeds thereof. The burden was on appellant to show his right to recover his commission upon such amount, which he has failed to do. The facts in these circumstances are therefore construed against him. 19 C.J.S. Corporations § 781, p. 154. This sum is deducted from the total sales price of all stock sold. This leaves $585,240.00 upon which amount appellant is entitled to 7½%, or $43,893.00, less what he has already received. It was stipulated at the trial that appellant had been paid $39,659.87. The amount, then, due him and unpaid is $4,233.13. This was the amount allowed by the trial court. We, consequently, affirm its judgment.

Affirmed.

## ON MOTION FOR REHEARING

 On further consideration we conclude that appellant is entitled perforce Art.

5070, R.C.S. 1925, to interest at six percent per annum from June 25, 1957, the date the commission contract was terminated by appellee. Federal Life Ins. Co. of Chicago v. Kriton, 112 Tex. 532, 249 S.W. 193; Trice Production Co. v. Dutton Drilling Co., Tex. Civ.App., 333 S.W.2d 607; Sullivan v. Brininstool, Tex.Civ.App., 358 S.W.2d 898. The judgment below is therefore reformed so as to bear interest at six percent per annum from June 25, 1957, and in all other respects is affirmed. The costs of appeal are taxed three-fourths to appellant and one-fourth to appellee.

In all other respects appellant's motion for rehearing is overruled.